## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: ) | |
| ) | Case No. 25-00145-ELG |
| SHILLINGS' CANNERY, L.L.C., ) | Chapter 11, Subchapter V |
| ) | |
| Debtor and Debtor-In-Possession. ) | |

### DEBTORS' OBJECTION TO CLAIM 4-1 OF FC 1331, LLC

Shillings' Cannery, L.L.C. ("Shillings'" or the "Debtor"), by counsel, files this *Objection to Claim 4-1 of FC 1331, LLC* (the "Objection"), and in support thereof states:

### Jurisdiction

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157.

### The Chapter 11 Case

2. On April 22, 2025 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession of its property and the management of its business as a debtor-in-possession, pursuant to sections 1107, 1108, 1183 and 1184 of the Bankruptcy Code.

### The Debtor And Its Business Operations

3. The Debtor is a limited liability company organized under the laws of the District of Columbia. The Debtor operates a restaurant located at 360 Water Street, SE, Washington D.C. 20003 d/b/a "Shilling Canning Company."

## The Lease

4. Prior to the Petition Date, the Debtor entered into a lease for non-residential real property (the "Lease") with FC 1331, LLC (the "Lessor"). The Lease expires July 31, 2030, with two five year renewal options.

5. During the COVID-19 Pandemic, on or about August 7, 2020, the Debtor and the Lessor entered into a Third Amendment to Lease (the "Third Amendment"). See **Exhibit A**[1] In Paragraph 3 of the amendment, Debtor and Lessor agreed that:

> 3. Landlord and Tenant hereby acknowledge and agree that for the period commencing May 1, 2020, and expiring May 31, 2020, Tenant shall have no obligation to pay Fixed Minimum Rent as set forth in the Lease (the "Abated Rent").

6. In Paragraph 4 of the amendment, Debtor and Lessor agreed that:

> 4. Landlord and Tenant hereby acknowledge and agree that for the period commencing June 1, 2020, and expiring June 30, 2021 (the "Alternate Rent Period"), Tenant shall have no obligation to pay Fixed Minimum Rent, Percentage Rent, Fixed Additional Rent, Tenant's Proportionate Share of Real Estate Taxes, or Tenant's Proportionate Share Insurance Costs as set forth in the Lease and in lieu thereof, each month Tenant shall pay to Landlord an amount equal to the greater of (i) Five Thousand and 00/100 Dollars ($5,000.00), or (ii) seven percent (7%) of Tenant's Gross Revenue for such month (the "Alternate Rent"). Within ten (10) days following the end of each month during the Alternate Rent Period, Tenant shall deliver to Landlord a statement setting forth Tenant's Gross Revenue for the previous month, together with the payment of the Alternate Rent for such previous month. Tenant's obligation to pay for all utilities consumed at the Premises shall not be deferred during the Alternate Rent Period. Upon the expiration of the Alternate Rent Period, Tenant's obligation to pay Fixed Minimum Rent, Percentage Rent, Fixed Additional Rent, Tenant's Proportionate Share of Real Estate Taxes, and Tenant's Proportionate Share Insurance Costs as set forth in the Lease shall be fully reinstated without any obligation of prior notice thereof by Landlord to Tenant. Tenant hereby acknowledges that during the month commencing July 1, 2021, Tenant shall be responsible for paying both the amounts otherwise due and payable pursuant to the Lease for such month and the Alternate Rent owed for the calendar month expiring June 30, 2021.

7. In Paragraph 9 of the amendment, Debtor and Lessor agreed that:

---

[1] The full lease and all amendments are attached to the Proof of Claim.

> 9. In the event that Tenant defaults in the payment of Alternate Rent or in the performance of any other terms, conditions or covenants of the Lease, as amended hereby, and such default continues beyond any applicable notice or cure period, then, in addition to all of the rights and remedies Landlord may have under the Lease, as amended hereby, at law, or in equity, Landlord's agreement to the Alternate Rent granted herein shall terminate immediately and be of no further force and effect, and Tenant shall be required to immediately pay to Landlord the full amount of the Abated Rent and all Fixed Minimum Rent, Percentage Rent, Fixed Additional Rent, Tenant's Proportionate Share of Real Estate Taxes, and Tenant's Proportionate Share Insurance Costs as set forth in the Lease, as amended hereby, during the period from May 1, 2020, through the date of any such default, as if no reduction of the same had been granted herein.

8. Debtor did not default in the payment of the Alternate Rent. Rather, Debtor defaulted in the payment of regular rent long after the "Alternate Rent Period" expired. As of the Petition Date, $148,649.45 was due to the Lessor, which is set forth in the Accounts Receivable Statement attached to Lessor's proof of claim 4-1 (the "Claim"), and scheduled as undisputed by the Debtor.

9. Nevertheless, the Claim also claims $129,648.45 in supposedly reinstated rent that came due during the Alternate Rent Period. This amount is disputed by the Debtor. It appears to be first conjured up by the Lessor after the bankruptcy was filed, as it was not included in the Eviction Complaint filed by the Lessor. **See Exhibit B.**

10. The Third Amendment only triggers Debtor to pay the reduced COVID Rent if there is a payment default in the *Alternate Rent*. As set forth in Part 3 of the Claim, all Alternate Rent has been paid.

11. However, the Lessor now for the first time appears to be asserting that a payment default subsequent to the payment of all of the Alternate Rent would also reinstate the requirement to pay the reduced COVID Rent. In that assertion, the Lessor ignores the more specific provision which limited triggering payment defaults to payment of the Alternate Rent.

12. District of Columbia law has long followed the Restatement (Second) of Contracts, which provides that "[s]pecific terms should be preferred over general language when

3

interpreting conflicting provisions of a contract." *Osborne v. Howard Univ. Physicians, Inc.*, 904 A.2d 335, 342–43 (D.C. 2006) (citing RESTATEMENT (SECOND) OF CONTRACTS § 203(c)). Further when "an integrated agreement has been negotiated with care and in detail and has been expertly drafted for the particular transaction, an interpretation is very strongly negated if it would render some provisions superfluous." Restatement (Second) of Contracts § 203 (1981). When interpreting a contract, the District of Columbia Court of Appeals "strive[s] to give reasonable effect to all its parts and eschew an interpretation that would render part of it meaningless or incompatible with the contract as a whole." *District of Columbia v. Young*, 39 A.3d 36, 40 (D.C.2012).

13. Lessor's newfound interpretation of the Third Amendment flies in the face of these principles. The Third Amendment was one of thousands of lease amendments negotiated during the COVID-19 pandemic to induce restaurant owners not to give up entirely. There is no indication that the Third Amendment was negotiated to give the Lessor a punitive Sword of Damocles if the Debtor ever defaulted on future rent. If every payment default under the lease triggered the reinstatement of reduced COVID rent, then there would be no need to specifically include nonpayment of Alternate Rent as a trigger. Rather, the correct interpretation of paragraph 9 of the Third Amendment is that the reduced COVID rent only gets reinstated if there was nonpayment of Alternate Rent *or a nonpayment default*. There was no such nonpayment default and therefore the COVID rent reinstatement is not triggered.

14. Additionally, "[u]nder the objective law of contracts, courts look first to the plain meaning of the document, and where the proper interpretation of the agreement cannot be derived from the contractual language exclusively, courts look also to the course of performance under the contract." *Sahrapour v. LesRon, LLC*, 119 A.3d 704, 716 (D.C. 2015) (internal

4

quotations omitted) (citing Restatement (Second) of Contracts § 203 (1981). The course of performance under this Agreement was that COVID-19 rent had been long forgiven. It was never demanded when the Debtor later defaulted in the payment of its rent, and it was not demanded when the Lessor filed an eviction complaint. It was only asserted once a bankruptcy was filed.

15. Lessor is bound by the judicial admissions it has made in its Eviction Complaint. "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are not evidence at all but rather have the effect of withdrawing a fact from contention." *Keller v. United States*, 58 F.3d 1194, 1199 n. 8 (7th Cir. 1995) (citing Michael H. Graham, *Federal Practice and Procedure: Evidence* § 6726 (Interim Edition)); *see also* John William Strong, *McCormick on Evidence* § 254, at 142 (1992). "[A] lawyer's statements may constitute a binding admission of a party[ ]" if the statements are " 'deliberate, clear, and unambiguous[.]' " *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (finding statements made in closing argument to be judicial admissions) (citing *Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty., Md.,* 608 F.3d 183, 190 (4th Cir.2010)). "It is clear that factual assertions made by a party in pleadings binds the pleading party to those same facts in a related subsequent case." *Wadi Food Indus. Co. S.A.E. v. Barclays Bank Delaware*, No. 2:18CV554, 2019 WL 2169209, at *7 (E.D. Va. May 2, 2019), report and recommendation adopted, No. 2:18CV554, 2019 WL 2163605 (E.D. Va. May 17, 2019); *see also In re Gosman*, 382 B.R. 826, 843 (S.D. Fla. 2007) (When judicial admissions are made by a trustee in one adversary proceeding, they are binding on that trustee in a separate adversary proceeding arising from the same bankruptcy case); *Cananwill, Inc. v. EMAR Group, Inc.*, 250

5

B.R. 533 (M.D.N.C.1999) (factual assertions made by parties in pleadings filed in one adversary proceeding, unless subsequently amended, are judicial admissions in related adversary proceeding).

16. These judicial admissions are not harmless. The assertions of the amount owed by the Debtor were instrumental in determining whether a bankruptcy was viable. Under the circumstances, principles of quasi-estoppel demand Lessor be bound to the amount that it previously said was owed. "Quasi-estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects." *In re Robb*, 23 F.3d 895, 898 (4th Cir. 1994) (*quoting Matter of Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991)). "Quasi-estoppel is an inherently flexible doctrine that is applied upon considerations of justice and fairness." *Rountree Motors, Inc. v. Commonwealth Dealers Life Ins. Co.*, No. 3:13CV47 (DJN), 2013 WL 4102161, at *10 (E.D. Va. Aug. 13, 2013). Quasi-estoppel "requires no concealment or misrepresentation of existing facts on the one side, and no ignorance or reliance on the other." *Cnty. Sch. Bd. v. RT*, 433 F. Supp. 2d 692, 704 (E.D. Va. 2006) (*quoting Ritter v. Ulman*, 78 F. 222, 224 (4th Cir. 1897)); see *also James River Mgmt. Co. v. Kehoe*, 2010 WL 431473 (E.D. Va. Feb. 5, 2010) ("[U]nlike some other forms of equitable estoppel, detrimental reliance is not an element of quasi-estoppel."). "[M]odern courts have held that quasi-estoppel applies when the offending party takes a different position than his or her original position, and, either the offending party gains an advantage or causes a disadvantage to the other party; the other party is induced to change positions; or, it would be unconscionable to permit the offending party to maintain an inconsistent position from which it has already derived a benefit or in which it has acquiesced." *Cnty. Sch. Bd. of Henrico Cnty., Vir. v. RT*, 433 F. Supp. 2d 692, 705 (E.D. Va. 2006). In this

6

case, had the Debtor known the Lessor would assert that the Third Amendment would require reinstatement of the reduced COVID rent, there is a strong possibility it might have decided a Chapter 11 bankruptcy was not viable, at least under Subchapter V.  The Lessor should be bound by principles of quasi-estoppel to have deemed the reduced COVID rent forgiven.

WHEREFORE, the Debtor respectfully requests that the foregoing Objection be sustained, that the Court allow Claim 4-1 in the amount of $148,649.45 only, and disallow any additional amounts owed, and that court grant Debtor its costs and fees for pursuing this objection, and that the Court grant such other relief as it deems appropriate and proper.

Dated:  August 7, 2025			Respectfully submitted,

/s/ *Justin P. Fasano*
McNamee Hosea, P.A.
Justin P. Fasano, Esquire (DC Bar MD21201)
6404 Ivy Lane, Suite 820
Greenbelt, MD 20770
Phone: 301-441-2420
jfasano@mhlawyers.com
*Counsel for Shillings' Cannery, L.L.C.*

## CERTIFICATE OF SERVICE

I further certify that on August 7, 2025, a copy of the foregoing Objection was served by CM/ECF to all parties receiving notice thereby, including Bradshaw Rost, Esq., counsel for the Lessor.

/s/  Justin P. Fasano
Justin P. Fasano